## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| *In Re Third Party Subpoena to Fusion GPS* ) <br> c/o Zuckerman Spaeder LLP ) <br> 1800 M Street, NW ) <br> Washington, DC 20036 ) <br> ) <br> ) <br> ) | Case No. 1:17-mc-02171-TSC |

| | |
|---|---|
| *Aleksej Gurbarev, XBT Holding S.A., and* ) <br> *Webzilla, Inc.*, ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> *Buzzfeed, Inc.* and *Ben Smith*, ) <br> ) <br> Defendants. ) <br> ) | Case No. 17-dv-60426-UU |

### PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITIES

Plaintiffs Aleksej Gubarev, XBT Holdings, S.A., and Webzilla, Inc. (collectively, "Plaintiffs") hereby provide the following supplemental authority in support of their Opposition to Fusion GPS's Motion to Quash Subpoena or, in the Alternative, For a Protective Order.

1. Judge Richard Leon's Memorandum Opinion dated January 4, 2018 in *Bean LLC d/b/a Fusion GPS v. John Doe Bank*, Civil Action No. 17-2187-RJL (D. D.C.). In that Order, Judge Leon rejected Fusion GPS's arguments in its attempt to resist a subpoena issued by the Permanent Select Committee on Intelligence of the United States House of Representatives.  Plaintiffs submit that many of the arguments rejected by Judge Leon – including Fusion GPS's First Amendment argument – are identical to those raised by Fusion GPS in this proceeding.  ***See Exhibit 1.***

2.  A New York Times Op-Ed article authored by Fusion GPS's principals, Glenn
    Simpson and Peter Fritsch, dated January 3, 2018 entitled "The Republicans' Fake
    Investigations" in which they discuss Fusion GPS's work on the Dossier at issue here.
    In particular, Messrs. Simpson and Fritsch state in that article that "Three
    congressional committees have heard over 21 hours of testimony from our firm,
    Fusion GPS. In those sessions, we toppled the far right's conspiracy theories and
    explained how The Washington Free Beacon and the Clinton campaign — the
    Republican and Democratic funders of our Trump research — separately came to hire
    us in the first place.  … And we handed over our relevant bank records — while
    drawing the line at a fishing expedition for the records of companies we work for that
    have nothing to do with the Trump case.  Republicans have refused to release full
    transcripts of our firm's testimony, even as they selectively leak details to media
    outlets on the far right. It's time to share what our company told investigators."
    Plaintiffs submit that Messrs. Simpson and Fritsch's public position in this article is
    directly at odds with Fusion GPS's continued failure to sit for its properly-
    subpoenaed deposition in the present matter.  ***See Exhibit 2.***

Dated:  January 5, 2018                    Respectfully submitted,


                                          s/ *Walter E. Diercks*

                                          Walter E. Diercks, Esq. (DC Bar #161610)
                                          RUBIN, WINSTON, DIERCKS, HARRIS &
                                              COOKE, LLP
                                          1201 Connecticut Avenue, N.W., Suite 200
                                          Washington, D.C. 20036
                                          (202) 861-0870
                                          wdiercks@rwdhc.com

Evan Fray-Witzer, Esq.
Pro hac vice
Ciampa Fray-Witzer, LLP
20 Park Plaza, Suite 505
Boston, MA 02116
(617) 426-0000
Evan@CFWLegal.com

## CERTIFICATE OF SERVICE

I hereby certify that on January 5, 2018 I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notice of Electronic Filing.

s/ *Walter E. Diercks*

Walter E. Diercks

Service List:

William W. Taylor, III,, Esq.
Steven M. Salky, Esq.
Rachel F. Cotton, Esq.
ZUCKERMAN SPAEDER, LLP
1800 M Street, NW
Suite 1000
Washington, DC 20036

EXHIBIT 1

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

BEAN LLC d/b/a FUSION GPS,      )
                       )
    Plaintiff,           )
                       )
    v.                 )        Civil Action No. 17-2187 (RJL)
                       )
JOHN DOE BANK,          )
                       )
    Defendant,         )
                       )
    and              )
                       )
PERMANENT SELECT COMMITTEE  )
ON INTELLIGENCE OF THE       )
UNITED STATES HOUSE OF       )
REPRESENTATIVES,         )
                       )
    Intervenor.        )

**FILED**

**JAN - 4 2018**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

## MEMORANDUM OPINION
January 4, 2018 [Dkt. #23]

       Bean LLC, doing business as Fusion GPS ("Fusion" or "plaintiff"), applies to this

Court for an order enjoining the enforcement of a Congressional subpoena ("the

Subpoena") that requires the production of certain financial records from Fusion's bank,

Defendant Bank ("the Bank").[1]  The Subpoena, issued by the Permanent Select

Committee on Intelligence of the U.S. House of Representatives ("the Committee"),

---

[1] On the same day that it filed its Complaint, Fusion moved for Defendant Bank to proceed under a pseudonym, arguing that, "if the name of its bank was[sic] made public, hackers interested in Plaintiffs' confidential information would go after the Defendant Bank's records." Mot. for Def. to Proceed Under a Pseudonym [Dkt. #3] 3.  The Court granted the motion.  *See* 10/20/17 Minute Order.

1

seeks records of Fusion's financial transactions with certain clients and contractors. The Committee issued the Subpoena in conjunction with its investigation into Russian active measures—*i.e.*, Russian conduct, direct and indirect in nature, calculated to advance Russia's political agenda—directed at the 2016 U.S. presidential election ("the 2016 Presidential election"). The Subpoena followed revelations in the press that Fusion had a role in compiling a series of memos—together commonly known as "the Trump Dossier" (also referred to herein as "the Dossier")—that alleges ties between President Donald Trump and the Kremlin.

Although the Subpoena was issued to Defendant Bank—not to Fusion—Fusion filed a motion for a temporary restraining order and preliminary injunction, seeking to enjoin the Bank from complying with the Subpoena on the ground that it is overly broad, unauthorized, and requests records of Fusion's business transactions that are irrelevant to the Committee's investigative inquiry. While the Committee and Fusion were able to negotiate a narrowing of the thousands of records responsive to the Subpoena, they unfortunately could not agree as to seventy of those records. As to these, Fusion asserts that the Subpoena violates its First Amendment rights to speech and association, as well as its rights under certain financial privacy laws. This matter is now fully briefed and ripe for resolution. Upon consideration of the pleadings, oral argument, and the entire record herein, Fusion's Renewed Motion for a Temporary Restraining Order and Preliminary Injunction is DENIED.

## BACKGROUND

The House Permanent Select Committee on Intelligence is a standing committee of the United States House of Representatives, charged with oversight of the intelligence community and intelligence-related activities and programs of the United States Government. *See* H.R. Res. 658, 95th Cong. (1977). Pursuant to those oversight responsibilities, the Committee is currently conducting an investigation into Russian interference with the 2016 Presidential election. *See* Press Release, U.S. House of Representatives Permanent Select Comm. on Intelligence, Intelligence Committee Chairman, Ranking Member Establish Parameters for Russia Investigation (Mar. 1, 2017) ("March 1, 2017 Press Release").[2] Among other things, the Committee's investigation is seeking answers to the following questions: (1) "What Russian cyber activity and other active measures were directed against the United States and its allies?" and (2) "Did the Russian active measures include links between Russia and individuals associated with political campaigns or any other U.S. Persons?" *Id.*

Fusion is a research firm that provides strategic intelligence, opposition research—including research on political candidates—and due diligence services to corporations, law firms, and investors. Decl. of Peter Fritsch ("Fritsch Decl.") [Dkt. #2-2] ¶ 6. During the 2016 Presidential election campaign, an unknown third party engaged Fusion's services to conduct political opposition research on then-candidate Donald J. Trump ("Mr. Trump"). *Id.* at ¶ 9; Decl. of Mark R. Stewart ("Stewart Decl.") [Dkt. #12-1] ¶ 5.

[2] This press release is available on the Committee's website at https://intelligence.house.gov/news/documentsingle.aspx?DocumentID=767.

3

In early 2016, that unknown client terminated its contract with Fusion, but another client took over the contract, seeking the same opposition research. Stewart Decl. ¶ 5. As part of this research, Fusion hired a former British intelligence officer, Christopher Steele ("Steele"), to research Mr. Trump's ties to Russia. *Id.* at ¶¶ 4, 6; Fritsch Decl. ¶ 9. Steele's research led to a series of memos that has become known in the press as the "Trump Dossier." Stewart Decl. ¶¶ 4, 6; Fritsch Decl. ¶ 9. The Dossier made unverified allegations of misconduct regarding Mr. Trump's relationship with Russian individuals, as well as allegations of collusion between the Trump campaign and representatives of the Russian government during the 2016 Presidential election. Stewart Decl. ¶ 6.

It was later revealed that Steele was paid an undisclosed sum of money for work he performed on behalf of the FBI, and that the Trump Dossier was provided to the FBI in 2016. *Id.* at ¶¶ 4–7, 9. It also came to light that other individuals in the Intelligence Community were aware of the Trump Dossier and its contents, and that they provided briefings about the Dossier to both President Obama and President-elect Trump in January 2017. *Id.* at ¶ 9. As a result, the Committee is seeking to discover, *inter alia*, who paid Fusion for the Trump Dossier, who received it, whether steps were taken to verify its accuracy, and whether the FBI relied on the Dossier as grounds for its counterintelligence investigation into potential coordination between the Trump campaign and the Russian government to influence the 2016 Presidential election.[3] *Id.* at ¶¶ 9–10.

---

[3] On March 20, 2017, during the Committee's first public hearing on its Russia investigation, then-FBI director, James B. Comey ("Comey"), revealed that, as part of the FBI's counterintelligence effort, it

After unsuccessful attempts to obtain relevant documents and testimony from Fusion itself, *see, e.g.*, Stewart Decl. ¶¶ 12–13, Committee Chairman Devin Nunes ("Chairman Nunes") issued subpoenas for testimony and documents to each of Fusion's principals. *Id.* at ¶ 14. Fusion's principals objected to these subpoenas, but on October 18, 2017, two of them appeared for compelled testimony, during which they invoked constitutional privileges not to testify pursuant to the First and Fifth Amendments. *Id.* at ¶¶ 16–17.

On October 5, 2017, the Committee served the Subpoena at issue in this dispute on Defendant Bank, seeking "all documents sufficient to identify Fusion GPS's banking transaction history, among other items, from August 1, 2015 to October 4, 2017." *Id.* at ¶ 14; Decl. of Joshua A. Levy ("Levy Decl.") Ex. A [Dkt. #2-3]. The Bank initially raised a number of objections to the Subpoena, but after the Committee rejected all of those objections, the Bank, on October 19, 2017, agreed to comply and produce all responsive documents by 9 A.M. on October 23, 2017. Stewart Decl. ¶ 18.

In response, Fusion immediately filed the instant action on October 20, 2017, seeking to enjoin the Bank from turning over records of Fusion's financial transactions to the Committee. *See* Compl. ¶ 3. Curiously, Fusion did not name the Committee as a

---

began investigating Russian interference in the 2016 Presidential election in July 2016. According to Comey, that investigation included inquiry into "possible links between the Trump campaign and the Russian government—and whether there was any coordination." Matthew Rosenberg, Emmarie Huetteman, & Michael S. Schmidt, *Comey Confirms F.B.I. Inquiry on Russia; Sees No Evidence of Wiretapping*, N.Y. TIMES, Mar. 20, 2017, https://www.nytimes.com/2017/03/20/us/politics/intelligence-committee-russia-donald-trump.html (noting that Comey "publicly confirmed an investigation into Russian interference in the presidential election and whether associates of [President Trump] were in contact with Moscow").

defendant, but instead listed only Defendant Bank. *See id.* at ¶ 9. This case was initially assigned to my colleague, Judge Tanya Chutkan, and she held a telephonic hearing with all interested parties—including the Committee—at 5 P.M. on the day the suit was filed. *See* 10/20/17 Minute Entry; Telephone Conference Tr., Oct. 20, 2017 [Dkt. #18]. The Committee formally intervened in this case the following day. *See* Mot. to Intervene [Dkt. #7]; 10/21/17 Minute Order (granting the Committee's Motion to Intervene).

After reviewing the pleadings, the Court again held a telephonic hearing with the parties on October 24, 2017. *See* 10/24/17 Minute Entry. Noting her "reluctan[ce] to wade into this dispute because it presents issues on which there is very little authority, and because it involves a congressional investigation in which [the Court does] not wish to intrude," the Court stated that "both sides have an interest in resolving this dispute short of judicial involvement." Telephone Conference Tr. 4:16–18, 5:22–25, Oct. 24, 2017 [Dkt. #17]. The Court accordingly "strongly encourage[ed] the parties to try and arrive at an agreement," and gave them until 6 P.M. on October 26, 2017 to do so. *Id.* at 5:24–25; 10/24/17 Minute Entry.

Spurred by the Court's directive, the parties were able to find common ground, and they entered into a Confidential Agreement that provided a mutually agreeable process by which the Committee could review the requested documents. The Court entered a Stipulation and Order binding the parties to the terms of the Confidential Agreement, and it also entered a Sealed Protective Order to preserve the confidentiality of the records sought by the Subpoena. *See* Stipulation & Order [Dkt. #19] 1. Two days

later, the Court dismissed the case, but it retained jurisdiction, should any disputes arise.
*Id.* at 2; Order of Dismissal [Dkt. #21].

While these events were unfolding, however, the Committee learned from a
*Washington Post* report that the Clinton campaign and the Democratic National
Committee ("DNC") had provided funding to Fusion for the research that resulted in the
Trump Dossier.  Decl. of Scott L. Glabe ("Glabe Decl.") [Dkt. #37-2] ¶ 11.  Specifically,
the *Washington Post* reported that Mark E. Elias, an attorney with the law firm Perkins
Coie—who represented both the Clinton Campaign and the DNC—was the individual
who retained Fusion for the purposes of gathering opposition research on Mr. Trump.  *Id.*
The Committee also learned from public reporting that Fusion was accused of acting as
an unregistered agent of the Russian government, in violation of the Foreign Agent
Registration Act, based on work it performed for Prevezon Holdings ("Prevezon"), a
Russian state-owned company.  *Id.* at ¶ 6.  This same report revealed that Prevezon
organized its lobbying efforts through the law firm Baker Hostetler, which was also
providing litigation services for Prevezon on a criminal asset forfeiture case being
brought by the U.S. Justice Department in the Southern District of New York.  *Id.* at ¶¶ 6,
21.  Together, these reports confirmed that various law firms and businesses had retained
Fusion on behalf of their clients to perform Russia-related work, thus triggering the
Committee's investigative interest in identifying other businesses that sought Fusion's
services during the same relevant time period.  *Id.* at ¶¶ 20–22.

On October 27, 2017, pursuant to the terms of the parties' Confidential
Agreement, the Bank produced certain responsive records, and the Committee reviewed

7

them. *Id.* at ¶¶ 12–15. The Committee's review was informed, in part, by classified information in the Committee's possession. *Id.* at ¶ 19. On November 1, 2017, the Committee identified eighty-two transactions necessary for its investigation that had not been previously produced by the Bank. *Id.* at ¶ 18. The Committee also sought re-production of thirty transactions already produced in the initial production. *Id.* In total, the Committee requested that Fusion instruct the Bank to produce, or re-produce, records of one hundred and twelve transactions. *Id.* To support its requests, the Committee also submitted a justification for each payor or payee, explaining the nexus between the records sought and the Committee's investigation. *Id.*

That same day, Fusion objected to the Committee's requests, arguing that the requested records—which contained financial transactions between Fusion and certain law firms, media companies, journalists, and contractors—were irrelevant to the Russia investigation. *See* Reply in Supp. of Pl.'s Renewed Appl. for a TRO & Mot. for Prelim. Inj. ("Pl.'s Renewed Reply") Ex. C [Dkt #35-3]. On November 3, 2017, the Bank produced twelve of the requested transactions, leaving seventy previously unproduced transactions—and thirty re-productions—outstanding. Glabe Decl. ¶ 33. The parties were ultimately unable to come to an agreement on these seventy remaining transactions, so plaintiff moved to reopen this case and filed its renewed motion for a temporary restraining order and preliminary injunction on November 3, 2017. *See* Mot. to Reopen Case [Dkt. #22]; Pl.'s Renewed Appl. for TRO & Mot. for Prelim. Inj. ("Pl.'s Renewed Mot.") [Dkt. #23]. Shortly thereafter, Judge Chutkan recused herself, and this case was

8

randomly reassigned to me on November 9, 2017. *See* Reassignment of Civil Case [Dkt. #29].

On November 15, 2017, I held the first hearing since plaintiff filed its renewed motion. *See* 11/15/17 Minute Entry. During this initial hearing, I consolidated plaintiff's motion for a temporary restraining order and motion for a preliminary injunction. Motions Hr'g Tr. 6:16–24, 7:2–6, November 15, 2017 [Dkt. #41]. I also expressed concern that all of the pleadings had been filed under seal. Noting that "having public, open hearings on a matter is in the best interest of all concerned," I ordered that the pleadings "be reconstituted and refiled not under seal." *Id.* at 7:10–11, 7:16–17. Although I permitted the parties to file certain documents under seal, the bulk of the pleadings were refiled in a redacted, public format. After reviewing the filings, I held oral argument on November 30, 2017, bifurcating the hearing into a public session for legal arguments, and a sealed session to discuss any confidential issues that might need to be addressed by the parties. *See* 11/30/17 Minute Entry. Plaintiff's motion is now ripe for my review.

## LEGAL STANDARD

Plaintiff is seeking a preliminary injunction, which requires compliance with the same standard as a temporary restraining order. *Hall v. Johnson*, 599 F. Supp. 2d 1, 3 n.2 (D.D.C. 2009). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits,[4] [2] that he is likely to suffer irreparable harm in the

---

[4] There is tension in the case law regarding whether a plaintiff seeking a preliminary injunction must show a "likelihood of success on the merits" or a "substantial likelihood of success on the merits." *Compare Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (requiring the plaintiff to show

absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (internal quotation marks omitted).   Because the relief Fusion seeks is "an extraordinary remedy," a preliminary injunction "should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

## ANALYSIS

Fusion opposes the Subpoena on four independent grounds:  (1) it lacks a valid legislative purpose; (2) it is overbroad and seeks information that is not relevant to the Committee's investigation; (3) it violates Fusion's First Amendment rights; and (4) it violates the Right to Financial Privacy Act ("RFPA"), 12 U.S.C. § 3401 *et seq.*, and the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. § 1601 *et seq.*  For the foregoing reasons, this Court finds Fusion's objections to the Subpoena to be unavailing and will DENY its motion.  I address each argument in turn.

### A. Fusion's Claim that the Subpoena Lacks a Valid Legislative Purpose

Plaintiff first contends that the Subpoena is invalid because it was issued without authority.  Specifically, plaintiff avers that, in issuing the Subpoena, "Mr. Nunes has acted alone, pursuant to no resolution."  Pl.'s Appl. for a TRO & Mot. for Prelim. Inj.

---

"likely" success on the merits), *with Sottera, Inc. v. FDA*, 627 F.3d 891, 893 (D.C. Cir. 2010) (requiring the plaintiff to show a "substantial likelihood" of success on the merits).  Unfortunately, our Circuit has avoided clarifying the standard. *See, e.g., Pursuing America's Greatness v. Fed. Elec. Comm.*, 831 F.3d 500, 505 n.1 (D.C. Cir. 2016) ("We need not resolve here any tension in the case law regarding the showing required on the merits for a preliminary injunction. . . . [because plaintiff] meets either standard.").  But even if Fusion need only show a likelihood of success on the merits—the less demanding standard—it has failed to do so.  I therefore need not resolve the ambiguity our Circuit has left in play on this issue.

("Pl.'s Mot.") [Dkt. #2-1] 7.  According to plaintiff, the Committee was required to have a "formal public 'unambiguous resolution' [to] authoriz[e] this investigation," and because no such resolution exists, "the subpoena is not part of a legitimate legislative activity."  *Id.*  I disagree.

To begin with, it is clear that Congress has delegated to the Committee its investigatory power over intelligence-related activities.  The Constitution provides that "[e]ach House [of Congress] may determine the Rules of its Proceedings," U.S. Const. art. I, § 5, cl. 2., and the House of Representatives has delegated this authority to its committees.  *See* Rules of the House of Representatives ("House Rules"), Rule XI.1(b)(1) ("Each committee may conduct at any time such investigations and studies as it considers necessary or appropriate in the exercise of its responsibilities.").[5]  Here, the Committee's responsibilities include oversight of "the activities of the intelligence community."  House Rule X.3(m); *see also* House Rule X.11(b)(1).  And to exercise this oversight role, the Committee is authorized to issue subpoenas for, among other things, "[t]he production of memoranda, documents, records, or any other tangible item."  Rules of the Permanent Select Comm. on Intelligence ("Comm. Rules"), Rule 10(b)(2)[6]; *see also* House Rule XI.2(m)(1)(B) ("For the purpose of carrying out any of its functions and duties . . . a committee or subcommittee is authorized . . . to require, by subpoena or otherwise, the attendance and testimony of such witnesses and the production of such

---

[5] The House Rules are available at http://clerk.house.gov/legislative/house-rules.pdf.
[6] The Committee Rules are available on the Committee's website at https://intelligence.house. gov/uploadedfiles/hpsci_rules_of_procedure_-_115th_congress.pdf.

books, records, correspondence, memoranda, papers, and documents as it considers

necessary.").

Plaintiff argues that, even if the Committee is authorized to conduct investigations

into intelligence-related issues, Chairman Nunes acted *ultra vires* in unilaterally issuing

the Subpoena, and thus the Subpoena is not legitimate legislative activity.  Pl.'s Mot. 5.

According to plaintiff, Chairman Nunes recused himself from the Committee's Russia

investigation, and "he himself remains under investigation by the House Ethics

Committee for his alleged misconduct related to [that] investigation."  *Id.*   Therefore,

under plaintiff's theory, Chairman Nunes acted outside the scope of his authority in

unilaterally issuing the Subpoena.  Unfortunately for plaintiff, the record contradicts its

claims.

The press release that plaintiff cites for the proposition that Chairman Nunes

recused himself indicates that Chairman Nunes would "have Representative Mike

Conaway . . . temporarily take charge of the Committee's Russia investigation while the

House Ethics Committee looks into the matter," but that he would "continue to fulfill all

[his] other responsibilities as Committee Chairman."  Press Release, U.S. House of

Representatives Permanent Select Comm. on Intelligence, Nunes Statement on Russia

Investigation (April 6, 2017).[7]  Nowhere in this press release did Chairman Nunes

"recuse" himself from the Russia investigation.  Instead, he simply designated another

Committee member to take charge of the investigation, as permitted by the Committee

---

[7] This press release is available on the Committee's website at https://intelligence.house.gov/news/
documentsingle.aspx?DocumentID=775.

12

Rules.  *See* Comm. Rule 9(b) ("An authorized investigation may be conducted by members of the Committee or Committee Staff designated by the Chair.").  And despite Chairman Nunes's decision to allow other Committee members to take charge of the Russia investigation pending the resolution of his ethics investigation, he retained the power to issue the Subpoena at issue in this case.  Pursuant to Committee Rule 10, "[a]ll subpoenas shall be authorized by the Chair of the full Committee" and are to "be signed by the Chair."  Comm. Rule 10(a), (c).  Indeed, the Subpoena would be invalid *without* Chairman Nunes's signature unless the full Committee authorized another member to sign it, which it did not.  *See* Comm. Rule 10(c).  Plaintiff's claim that Chairman Nunes's decision to allow Representative Conaway to take charge of the investigation somehow stripped him of his powers as Chairman is therefore unfounded.

Plaintiff counters that the Subpoena is still invalid because the Russia investigation was not authorized by a "formal public" resolution.  Pl.'s Mot. 7.  Fusion's theory appears to be that every Congressional investigation must be authorized by a separate formal resolution in order to qualify as legitimate legislative activity.  To say the least, that is wishful thinking !  In considering the scope of the Congressional investigative power, the Supreme Court has required only a grant of authority "sufficient to show that the investigation upon which the [Committee] had embarked concerned a subject on which 'legislation could be had.'"  *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 506 (1975) (quoting *McGrain v. Daugherty*, 273 U.S. 135, 177 (1927)).  Here, the House Rules authorize the Committee to "review and study on a continuing basis laws, programs, and activities of the intelligence community."  House Rule X.3(m).  And

13

the Committee Rules empower the Committee to "conduct investigations only if approved by the Chair, in consultation with the Ranking Minority Member." Comm. Rule 9(a). The record makes clear that the Committee's Russia investigation, which implicates the intelligence community's response to Russian active measures directed against the United States, has been so authorized by both the Chairman and the Ranking Member. *See* March 1, 2017 Press Release ("Ranking [Minority] Member Schiff stated, 'The House Intelligence Committee must conduct a bipartisan investigation into Russia's interference in our election.'"). Plaintiff's insistence that this Court require more has no basis in the law. I therefore conclude that the Subpoena was a valid part of the Committee's legitimate legislative investigation.

### B. Fusion's Challenge to the Breadth of the Subpoena and the Relevance of the Records Sought

Fusion next asserts that the Subpoena is overbroad because it seeks to compel production of records not pertinent to the Committee's investigation. Pl.'s Renewed Mot. 8. Specifically, Fusion objects to the Committee's request for bank records related to its transactions with ten law firms on the ground that "[n]one of the law firms about which Intervenor seeks information (other than Perkins Coie and Baker Hostetler) contracted with Fusion GPS to perform work related to Russia or Donald Trump, in any way." *Id.* at 9. Fusion similarly alleges that the request for records of transactions between Fusion and certain media companies, journalists, and businesses are "not pertinent." *Id.* at 9–11. Plaintiff therefore asks that I enjoin the Bank's compliance with the Committee's

14

outstanding request for the seventy responsive transactions on the ground that those records are irrelevant to the Committee's legitimate Congressional inquiry.

This Court, however, lacks the authority to restrict the scope of the Committee's investigation in the manner plaintiff suggests. Congress's power to investigate "is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution." *Eastland*, 421 U.S. at 504 n.15. Indeed, "[t]he power of inquiry has been employed by Congress throughout our history, over the whole range of the national interests concerning which Congress might legislate or decide upon due investigation not to legislate." *Barenblatt v. United States*, 360 U.S. 109, 111 (1959). And the Supreme Court has left no doubt that the issuance of subpoenas is "a legitimate use by Congress of its power to investigate." *Eastland*, 421 U.S. at 504. While Fusion is correct that "Congress' investigatory power is not, itself, absolute" and that it "is not immune from judicial review," Pl.'s Renewed Mot. 5, this Court will not—and indeed, may not— engage in a line-by-line review of the Committee's requests. *Cf. McSurely v. McClellan*, 521 F.2d 1024, 1041 (D.C. Cir. 1975) ("There is no requirement that every piece of information gathered in [a Congressional] investigation be justified before the judiciary.").

Instead, where, as here, an investigative subpoena is challenged on relevancy grounds, "the Supreme Court has stated that the subpoena is to be enforced 'unless the district court determines that there is no reasonable possibility that the category of materials the Government seeks will produce information relevant to the general subject of the . . . investigation.'" *Senate Select Comm. on Ethics v. Packwood*, 845 F. Supp. 17,

15

21 (D.D.C. 1994) (quoting *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 301

(1991)).  In determining the proper scope of the Subpoena, "this Court may only inquire

as to whether the documents sought by the subpoena are 'not plainly incompetent or

irrelevant to any lawful purpose [of the Committee] in the discharge of [its] duties.'"

*Packwood*, 845 F. Supp. at 20–21 (quoting *McPhaul v. United States*, 364 U.S. 372, 381

(1960)).  And "[t]he burden of showing that the request is unreasonable is on the

subpoenaed party."  *FTC v. Texaco, Inc.*, 555 F.2d 862, 882 (D.C. Cir. 1977).

   After reviewing the record in this case, I cannot say that the documents sought by

the Subpoena are "plainly incompetent or irrelevant" to the Committee's lawful purpose.

*Packwood*, 845 F. Supp. at 20–21.  Public reporting has revealed that two law firms,

Perkins Coie and Baker Hostetler, engaged plaintiff's services on matters directly related

to the Committee's investigation.  Glabe Decl. ¶¶ 20–22.  This fact alone provides a

reasonable basis to believe that Fusion's transactions with other law firms during the

same time frame may reveal similarly relevant information.

   The Committee also has intelligence suggesting that Fusion directed Steele to

meet with at least five major media outlets to discuss his work on the Trump Dossier.  *Id.*

at ¶ 27.  It is thus reasonable for the Committee to pursue records containing Fusion's

transactions with various media companies and journalists to determine whether they,

too, had involvement with the Trump Dossier or with Russian active measures directed at

the 2016 Presidential election.  And the same is true with respect to the Committee's

request for records of transactions related to certain businesses:  the Committee possesses

intelligence that links these businesses to Russia and Russian operatives, and thus the

16

transactions between Fusion and these businesses could potentially enable the Committee to investigate the nature of these relationships. *Id.* at ¶¶ 28–30. While Fusion assures the Court that the requested records do not, in fact, contain any transactions that are pertinent to the Committee's Russia investigation, Pl.'s Renewed Mot. 9–11, "it is manifestly impracticable to leave to the subject of the investigation alone the determination of what information may or may not be probative of the matters being investigated." *Packwood*, 845 F. Supp. at 21. This is particularly true here, where the full scope of the Committee's investigation is classified, and thus plaintiff cannot possibly know the complete justifications for the Committee's requests for certain documents. *See* Glabe Decl. ¶ 19.

Because the Committee possesses the power to investigate Russian active measures directed at the 2016 Presidential election, and there is a reasonable possibility that the records requested will contain information relevant to that investigation, the Subpoena is not impermissibly broad, even if the records turn out to be unfruitful avenues of investigation. *See Eastland*, 42 U.S. at 509 ("Nor is the legitimacy of a congressional inquiry to be defined by what it produces. The very nature of the investigative function—like any research—is that it takes the searchers up some 'blind alleys' and into nonproductive enterprises. To be a valid legislative inquiry there need be no predictable end result."). This is particularly true in light of the fact that, at this stage of the proceedings, the Committee is acting as the "legislative branch equivalent of a grand jury, in furtherance of an express constitutional grant of authority." *Packwood*, 845 F. Supp. at 21. It is "well-established that such investigative bodies enjoy wide latitude in pursuing possible claims of wrongdoing, and the authority of the courts to confine their

17

investigations is extremely limited." *Id.* Thus, conscious of the significant separation of powers principles at play in this litigation, and in light of my finding that the records the Committee has requested could reasonably produce information relevant to the general subject of the Committee's inquiry, I need inquire no further into the scope of the Subpoena in this case. *Cf. Barenblatt*, 360 U.S. at 132 ("So long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power.").

## C. Fusion's First Amendment Challenge

Plaintiff's third basis for enjoining the Bank's compliance with the Subpoena is grounded in First Amendment considerations. Specifically, Fusion asserts that the Bank's compliance with the Subpoena "would abridge Plaintiff's First Amendment rights to engage in free political speech, free political activity, and free association." Pl.'s Mot. 11. According to plaintiff, disclosure of its financial records would reveal the identity of its clients, and thus would hinder them from contracting anonymously with Fusion in the future. To bolster this assertion, plaintiff submitted affidavits from anonymous law firm partners and owners of consulting firms who asserted that they would not have engaged Fusion's services if they had known that their association would not be kept confidential. *See, e.g.*, Pl.'s Reply in Supp. of Appl. for a TRO & Mot. for Prelim. Inj. ("Pl.'s Reply") Ex. 5 [Dkt. #13-3]; Pl.'s Reply Ex. 7 [Dkt. #13-5]. If Fusion's commercial relationship with its clients were revealed, plaintiff insists, it would chill Fusion's ability to do certain kinds of political work and associate with its clients anonymously. Pl.'s Mot. 12–14. At bottom, Fusion's argument amounts to a claim that the Subpoena intrudes on its

18

associational rights under the First Amendment because it would hinder its ability to associate anonymously with its clients, and would thus chill its protected political activity. Unfortunately for plaintiff, I cannot agree.

Plaintiff alleges that the Committee's disclosure requests violate the private nature of plaintiff's relationships with its customers—relationships that plaintiff claims are protected by the First Amendment. But plaintiff points to *no* authority to support its theory that the freedom of association protects financial records. And this is not surprising, given that commercial transactions do not give rise to associational rights, even where the subjects of those transactions are protected by the First Amendment. Indeed, courts have uniformly held that the kind of commercial relationships Fusion seeks to shield from governmental inquiry here are not protected as associational rights under the First Amendment.

For example, in *FEC v. Automated Bus. Servs.*, 888 F. Supp. 539 (S.D.N.Y. 1995), the court rejected a First Amendment challenge to subpoenas that were issued to vendors who engaged in business with political associations. It did so on the ground that the subpoenas sought "information regarding corporate and business transactions, *not* information regarding any political association the [vendor] may have had with [its customer]." *Id.* at 541–42 (emphasis added). The Court reasoned that, "[a]lthough members of a political association and contributors to a political association have First Amendment associational rights that may be implicated when an administrative agency serves that political association with a subpoena, the Vendors have failed to cite any law in support of the proposition that a party that vends goods or services to a political

association is entitled to similar First Amendment protection." *Id.* (internal citations omitted).

Similarly, in *In re Grand Jury Subpoena Served Upon Crown Video Unlimited, Inc.*, 630 F. Supp. 614 (E.D.N.C. 1986), the court held that the commercial relationship between a customer and a video store owner "is not protected as an association right arising under the [F]irst [A]mendment" because "[t]here has been no showing that any of the subpoenaed corporations, in tandem with their respective clients, have advocated political, economic, religious or cultural beliefs through their commercial relationship." *Id.* at 619. Thus, while the court held that the videotapes involved in the commercial transactions were a form of speech protected by the First Amendment, the commercial relationship was not. *Id.* The same principle applies here.

While the opposition research Fusion conducted on behalf of its clients may have been political in nature, Fusion's commercial relationship with those clients was not, and thus that relationship does not provide Fusion with some special First Amendment protection from subpoenas. *Cf. United States v. Bell*, 414 F.3d 474, 485 (3d Cir. 2005) (tax professional's customer list not protected); *IDK, Inc. v. Cty. of Clark*, 836 F.2d 1185, 1193–95 (9th Cir. 1988) (escort-client relationship not protected); *In re Grand Jury Subpoena Served Upon PHE, Inc.*, 790 F. Supp. 1310, 1317 (W.D. Ky. 1992) (commercial relationship between publisher and customers not protected). To hold otherwise would be to allow any entity that provides goods or services to a customer who engages in political activity to resist a subpoena on the ground that its client engages in political speech. Surely, to recast a line from the great Justice Robert H. Jackson, the

First Amendment is not a secrecy pact ! *See Terminiello v. City of Chicago*, 337 U.S. 1, 37 (1949) (Jackson, J., dissenting). Here, while Fusion's clients may have First Amendment rights associated with their political affiliations, Fusion has failed to establish that it is entitled to similar First Amendment protection on the basis of its clients' political activities.

Moreover, it is worth noting that the likelihood of Fusion's financial transactions—let alone the nature of the work being performed for Fusion's clients—being made public is quite low. The financial records the Committee seeks show only the name of the payor or payee, the amount of the payment, and certain identifying information; they do *not* indicate what the payment was for. And the Committee's executive session rules—which require subpoenaed materials, including the seventy transactions at issue in this case, to be kept confidential—are designed to prevent the disclosure that plaintiff fears. *See* Comm. Rule 12(a)(1) ("[M]embers of the Committee and Committee Staff shall not at any time, either during that person's tenure as a member of the Committee or as Committee Staff, or anytime thereafter, discuss or disclose, or cause to be discussed or disclosed . . . [a]ny information received by the Committee in executive session."); House Rule VIII.3(b) ("Under no circumstances may minutes or transcripts of executive sessions, or evidence of witnesses in respect thereto, be disclosed or copied."); Stewart Decl. ¶ 20 ("Consistent with Committee and House Rules, it is the Committee's standard and consistent practice to handle any documents produced to the Committee pursuant to a subpoena as executive session material.").

Plaintiff, not surprisingly, rejoins that the Committee's "assurance that the records will be maintained in confidence . . . gives no comfort." Pl.'s Reply 5. To support its fears, Fusion alleges that the Committee "leaked the identity of Defendant Bank to the media" and leaked the fact that Fusion's principals asserted constitutional privileges during their executive session interviews. *Id.* Thus, according to plaintiff, the Committee cannot be trusted with other confidential information, even if it promises to protect that information as executive session material. But apart from plaintiff's blanket accusations in its briefing and at oral argument, Fusion has provided no evidence to support these allegations. The mere fact that confidential information was disclosed to the public, without more to show that the Committee played a role in the disclosure, casts no doubt on the Committee's compliance with its executive session rules. This is especially true in light of the fact that Fusion itself has played a role in publicizing aspects of this litigation and the Committee's investigation. *See, e.g.*, Jeremy Herb & Evan Perez, *Fusion GPS Partners Plead Fifth Before House Intel*, CNN, Oct. 18, 2017, (noting that *Fusion's attorney* revealed that Fusion's principals invoked their Fifth Amendment rights not to answer questions before the Committee).[8] Therefore, absent evidence to suggest that the Committee will not follow its own rules—and plaintiff has presented this Court with none—I must presume that those rules are being followed. *See In re Navy Chaplaincy*, 850 F. Supp. 2d 86, 94 (D.D.C. 2012) ([W]ell-settled case law

---

[8] This article is available at http://www.cnn.com/2017/10/18/politics/fusion-gps-partners-plead-fifth-before-house-intel/index.html.

. . . requires a court to presume that government officials will conduct themselves properly and in good faith.").[9]

For all of these reasons, I find that Fusion has failed to show that compliance with the Subpoena poses an actual, meaningful threat to its First Amendment rights.[10]

### D. Fusion's Challenges Pursuant to the RFPA and the GLBA

Finally, plaintiff argues that compliance with the Subpoena would violate two distinct statutory schemes. First, plaintiff asserts that the RFPA, 12 U.S.C. § 3401 *et seq.*, "prohibits banks from releasing customer records to a Government authority," and thus the Bank's release of the disputed records would violate that Act. Pl.'s Mot. 8. Second, plaintiff alleges that the GLBA, 15 U.S.C. § 1601 *et seq.*, prohibits the Bank from "disclos[ing] to a nonaffiliated third party any nonpublic personal information," and because Fusion did not receive the statutorily mandated notice and opportunity to opt out, the Subpoena cannot be enforced *Id.* at 11. Ultimately, I find both of plaintiff's arguments to be without merit. How so?

To begin with, plaintiff has no rights under the RFPA because it is not a "person" who may qualify as a "customer" for the purposes of that statute. A "customer" is

---

[9] Needless to say, I fully expect the Committee to abide scrupulously by all of its representations before the Court on this issue.

[10] Fusion also asserts that the Subpoena "will violate Plaintiff's . . . confidentiality obligations" and its "privacy rights." Pl.'s Renewed Mot. 3–4. With respect to plaintiff's alleged privacy rights, the Supreme Court has made clear that there is no constitutional right to privacy in bank records. *See United States v. Miller*, 425 U.S. 435, 442 (1976) (noting "[t]he lack of any legitimate expectation of privacy concerning the information kept in bank records"). And with respect to plaintiff's alleged confidentiality obligations, plaintiff has cited no contractual obligation to retain the confidentiality of its commercial transactions, but even if it had, courts routinely enforce disclosure of client identities as part of a legitimate investigation. *See, e.g., United States v. Ritchie*, 15 F.3d 592, 602 (6th Cir. 1994) ("[V]irtually every court to consider the issue has concluded that client identity and payment of fees is not privileged information."). Plaintiff's arguments on these points are to no avail.

defined under the RFPA as "any person or authorized representative of that person who utilized or is utilizing any service of a financial institution." 12 U.S.C. § 3401(5). A "person" is defined in the RFPA as "an individual or a partnership of five or fewer individuals." *Id.* at § 3401(4). Plaintiff is a limited liability company organized under Delaware law, *see* Compl. ¶ 6; it is not a partnership or an individual. Fusion insists that a limited liability company "is akin to a limited partnership," and thus it should be treated as a customer under the RFPA. Pl.'s Reply 18. But in construing the terms of the RFPA, I "adher[e] strictly to the explicit, unambiguous definition of customer found in the Act." *Ridgeley v. Merchants State Bank*, 699 F. Supp. 100, 102 (N.D. Tex. 1988). Because the RFPA's definition of person is not ambiguous, but instead is clearly set out in the definitions section of the statute, I must apply its plain, ordinary meaning. *See Pittsburgh Nat'l Bank v. United States*, 771 F.2d 73, 75 (3d Cir. 1985) ("[A] definition which declares what a term means excludes any meaning that is not stated." (internal citations, alterations, and quotation marks omitted)). Indeed, other courts to address this issue have reached the same conclusion. *See, e.g., Exchange Point LLC v. SEC*, 100 F. Supp. 2d 172, 174 (S.D.N.Y. 1999) ("The Court concludes that Movant, as a limited liability company, is not a person as defined by the RFPA and does not have standing to object to the Subpoena."). Fusion accordingly may not object to the Subpoena by invoking the protections of the RFPA.

Unfortunately for plaintiff, the text of the statute equally forecloses Fusion's claim of rights under the GLBA. The GLBA applies to the disclosure of "nonpublic personal information" of a "consumer." 15 U.S.C. § 6802(a). The Act defines a "consumer" as

24

"an individual who obtains, from a financial institution, financial products or services which are to be used primarily for personal, family, or household purposes" or "the legal representative of such an individual." *Id.* at § 6809(9). Plaintiff is a limited liability company, not an individual, *see* Compl. ¶ 6, and thus the GLBA does not shield plaintiff from the Committee's document requests.

## CONCLUSION

The Subpoena at issue in today's case was issued pursuant to a constitutionally authorized investigation by a Committee of the U.S. House of Representatives with jurisdiction over intelligence and intelligence-related activities—activities designed to protect us from potential cyber-attacks now and in the future. The Subpoena seeks the production of records of financial transactions that have a "reasonable possibility," *Packwood*, 845 F. Supp. at 21, of producing information relevant to that constitutionally authorized investigation. Although the records being sought by the Subpoena are sensitive in nature—and merit the use of appropriate precautions by the Committee to ensure they are not publicly disclosed—the nature of the records themselves, and the Committee's procedures designed to ensure their confidentiality, more than adequately protect the sensitivity of that information.

Thus, because I find all of Fusion's objections to the Subpoena to be unavailing, Fusion cannot satisfy the first factor of its burden for obtaining a preliminary

injunction—a likelihood of success on the merits—and I need go no further.[11]  Plaintiff's

motion must therefore be DENIED.

RICHARD J. LEON
United States District Judge

---

[11] Our Circuit has traditionally evaluated the four factors required for a preliminary injunction on a "sliding scale" approach, such that, "[i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009).  It is not clear, however, whether our Circuit's sliding-scale approach survives the Supreme Court's decision in *Winter*, 555 U.S. at 7.  *See Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) ("[W]e read *Winter* at least to suggest if not to hold that a likelihood of success is an independent, free-standing requirement for a preliminary injunction." (internal quotation marks omitted)).  I need not, however, resolve our Circuit's lack of clarity on this issue because I conclude that a preliminary injunction is improper "even under the less demanding sliding-scale analysis." *Id.*

First, plaintiff cannot establish irreparable harm because it has not proffered any "proof that the harm has occurred in the past and is likely to occur again, or proof that the harm is certain to occur in the near future." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).  Plaintiff makes only conclusory allegations that its business associations will be harmed and its First Amendment rights will be chilled if I do not grant a preliminary injunction. Pl.'s Mot. 11–14. But as I have already concluded, *see supra* pp. 21–22, plaintiff's fears that its private information will be publicly disclosed are misplaced in light of the fact that the Committee has guaranteed that any records produced by the Bank will be protected as executive session material. *See* Stewart Decl. ¶ 20; *Exxon Corp. v. F.T.C.*, 589 F.2d 582, 589 (D.C. Cir. 1978) ("[T]here is no indication that disclosure to the Subcommittee . . . will in any way harm the appellants. We have heretofore held that release of information to the Congress does not constitute 'public disclosure.' . . . The courts must presume that the committees of Congress will exercise their powers responsibly and with due regard for the rights of affected parties."). Plaintiff accordingly has not met its burden of establishing irreparable harm.

Second, the balance of equities weighs in favor of denying the injunction, given that the Committee's investigation concerns issues of national importance, and the investigation has already been substantially delayed by the Committee's inability to review the documents at issue in this case. And third, there is a strong public interest in allowing Congress to complete its investigation expeditiously to ensure the integrity of our national elections and the security of our intelligence community. Indeed, there is a "clear public interest in maximizing the effectiveness of the investigatory powers of Congress," and thus it "would . . . require an extremely strong showing . . . to succeed in obtaining an injunction in light of the compelling public interest in denying such relief." *Id.* at 594. Plaintiff has not made such a showing here. I therefore hold that plaintiff has failed to satisfy its burden on all four elements of a preliminary injunction, regardless of which test I apply.

EXHIBIT 2

Case 1:17-mc-02171-TNM   Document 13-2   Filed 01/05/18   Page 2 of 5

**The New York Times** | https://nyti.ms/2EGnPpY

Opinion | OP-ED CONTRIBUTORS

# The Republicans' Fake Investigations

By GLENN R. SIMPSON and PETER FRITSCH   JAN. 2, 2018

A generation ago, Republicans sought to protect President Richard Nixon by urging the Senate Watergate committee to look at supposed wrongdoing by Democrats in previous elections. The committee chairman, Sam Ervin, a Democrat, said that would be "as foolish as the man who went bear hunting and stopped to chase rabbits."

Today, amid a growing criminal inquiry into Russian meddling in the 2016 election, congressional Republicans are again chasing rabbits. We know because we're their favorite quarry.

In the year since the publication of the so-called Steele dossier — the collection of intelligence reports we commissioned about Donald Trump's ties to Russia — the president has repeatedly attacked us on Twitter. His allies in Congress have dug through our bank records and sought to tarnish our firm to punish us for highlighting his links to Russia. Conservative news outlets and even our former employer, The Wall Street Journal, have spun a succession of mendacious conspiracy theories about our motives and backers.

We are happy to correct the record. In fact, we already have.

Three congressional committees have heard over 21 hours of testimony from our firm, Fusion GPS. In those sessions, we toppled the far right's conspiracy theories and explained how The Washington Free Beacon and the Clinton campaign — the Republican and Democratic funders of our Trump research — separately came to hire us in the first place.

We walked investigators through our yearlong effort to decipher Mr. Trump's complex business past, of which the Steele dossier is but one chapter. And we handed over our relevant bank records — while drawing the line at a fishing expedition for the records of companies we work for that have nothing to do with the Trump case.

Republicans have refused to release full transcripts of our firm's testimony, even as they selectively leak details to media outlets on the far right. It's time to share what our company told investigators.

We don't believe the Steele dossier was the trigger for the F.B.I.'s investigation into Russian meddling. As we told the Senate Judiciary Committee in August, our sources said the dossier was taken so seriously because it corroborated reports the bureau had received from other sources, including one inside the Trump camp.

The intelligence committees have known for months that credible allegations of collusion between the Trump camp and Russia were pouring in from independent sources during the campaign. Yet lawmakers in the thrall of the president continue to wage a cynical campaign to portray us as the unwitting victims of Kremlin disinformation.

We suggested investigators look into the bank records of Deutsche Bank and others that were funding Mr. Trump's businesses. Congress appears uninterested in that tip: Reportedly, ours are the only bank records the House Intelligence Committee has subpoenaed.

We told Congress that from Manhattan to Sunny Isles Beach, Fla., and from Toronto to Panama, we found widespread evidence that Mr. Trump and his organization had worked with a wide array of dubious Russians in arrangements that often raised questions about money laundering. Likewise, those deals don't seem to interest Congress.

We explained how, from our past journalistic work in Europe, we were deeply familiar with the political operative Paul Manafort's coziness with Moscow and his financial ties to Russian oligarchs close to Vladimir Putin.

Finally, we debunked the biggest canard being pushed by the president's men — the notion that we somehow knew of the June 9, 2016, meeting in Trump Tower between some Russians and the Trump brain trust. We first learned of that meeting from news reports last year — and the committees know it. They also know that these Russians were unaware of the former British intelligence officer Christopher Steele's work for us and were not sources for his reports.

Yes, we hired Mr. Steele, a highly respected Russia expert. But we did so without informing him whom we were working for and gave him no specific marching orders beyond this basic question: Why did Mr. Trump repeatedly seek to do deals in a notoriously corrupt police state that most serious investors shun?

What came back shocked us. Mr. Steele's sources in Russia (who were not paid) reported on an extensive — and now confirmed — effort by the Kremlin to help elect Mr. Trump president. Mr. Steele saw this as a crime in progress and decided he needed to report it to the F.B.I.

We did not discuss that decision with our clients, or anyone else. Instead, we deferred to Mr. Steele, a trusted friend and intelligence professional with a long history of working with law enforcement. We did not speak to the F.B.I. and haven't since.

After the election, Mr. Steele decided to share his intelligence with Senator John McCain via an emissary. We helped him do that. The goal was to alert the United States national security community to an attack on our country by a hostile foreign power. We did not, however, share the dossier with BuzzFeed, which to our dismay published it last January.

We're extremely proud of our work to highlight Mr. Trump's Russia ties. To have done so is our right under the First Amendment.

It is time to stop chasing rabbits. The public still has much to learn about a man with the most troubling business past of any United States president. Congress should release transcripts of our firm's testimony, so that the American people can learn the truth about our work and most important, what happened to our democracy.

Glenn R. Simpson and Peter Fritsch, both former journalists, are the founders of the research firm Fusion GPS.

*Follow The New York Times Opinion section on* Facebook *and* Twitter *(@NYTopinion), and sign up for the* Opinion Today newsletter.

A version of this op-ed appears in print on January 3, 2018, on Page A15 of the New York edition with the headline: The Republicans' Fake Inquiry.

© 2018 The New York Times Company